SIXTH DIVISION
JUNE 4, 2010

No. 1-08-3607

| | | |
|---|---|---|
| ELIZABETH GUTSTEIN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 05 L 002597 |
| | ) | |
| CITY OF EVANSTON, a Municipal Corporation, | ) | Honorable |
| | ) | Edward Washington II |
| Defendant-Appellant. | ) | Judge Presiding |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Plaintiff Elizabeth Gutstein filed suit in the circuit court of Cook County against the municipal defendant, the City of Evanston (City), alleging that she fell and suffered injuries to her elbow resulting from the municipality's negligent maintenance of an unimproved alley in back of plaintiff's home. A jury returned a verdict in favor of plaintiff in the amount of $201,829.00, less a 50% deduction for contributory negligence, and the trial court entered judgment on that verdict. The City appeals the trial court's denial of its timely filed posttrial motion. On appeal, the City argues that (1) plaintiff was not an intended user of the alley and thus the City is entitled to a judgment *n.o.v.*, (2) the trial court abused its discretion in deciding that plaintiff was an intended user as a matter of law, and (3) the City was entitled to immunity from liability pursuant to section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2-201 (West 2008)).

BACKGROUND

On July 10, 2004, plaintiff pulled a weed from the backyard garden of her home in Evanston and decided to dispose of the unwanted plant in the yard waste disposal bin provided for her use by the City. Two unimproved alleys abut plaintiff's property. One alley runs north-

south along the eastern edge of plaintiff's property and the other runs east-west along the southern edge of the property. Plaintiff's yard waste bin, along with disposal containers for recycling and trash, sit outside plaintiff's property along the east-west alley (alley). A gated fence encircles plaintiff's backyard, so plaintiff proceeded down a path through her backyard to the gate to enter the alley. When she reached the gate, plaintiff testified that she scanned the area to make sure there were no depressions or other impediments in the alley. Prior to stepping out into the alley, plaintiff heard an ice cream truck driving along the alley and turned to locate the vehicle. She then stepped out into the alley and tripped in a "softball-sized" depression in the unimproved alley, causing her to fall and suffer injuries to her elbow.

Plaintiff's partner, Patricia Butkus, testified at trial that she had been complaining to the City about the condition of the east-west alley for years. Ms. Butkus testified that she telephoned the City on numerous occasions and left voice-mail messages with the public works department. In March 2004, Ms. Butkus exchanged e-mail correspondence with City Alderman Elizabeth Tisdahl, in which she complained that commercial traffic[1] was damaging the alley and creating a dangerous condition in the vicinity of the gate to Ms. Butkus's and plaintiff's property. Ms. Butkus testified that Alderman Tisdahl visited the alley shortly thereafter and agreed that the area around the gate was in poor condition. Alderman Tisdahl assured Ms. Butkus that she would place the plaintiff's residence on the City's priority list for alley repairs and instructed Ms. Butkus to telephone the City to follow up and confirm that this was done.

---

[1] A locally popular hot dog stand, Mustard's Last Stand, is located south of the east-west alley and commercial vehicles travel along the alley to make deliveries there. The property east of Mustard's is the location of Northwestern University's football stadium.

The alley abutting plaintiff's property is what the City calls an "unimproved alley," meaning that it is unpaved. There was some dispute at trial as to what material constituted the surface of the alley at the time of plaintiff's injury. Plaintiff argued that the alley surface consisted of limestone gravel while the City maintained that the alley had been resurfaced with asphalt chips. Both parties agree that the ravages of winter cause significant damage to the surface of an unimproved alley. In order to address this problem, the City had instituted a program of annually regrading its unimproved alleys.

Glen Crabtree, a public works supervisor for the City, testified for the plaintiff as an adverse witness pursuant to section 2-1102 of the Code of Civil Procedure (735 ILCS 5/2-1102 (West 2008)). Mr. Crabtree's duties included the care and maintenance of the City's alleys, streets, and sidewalks. As a supervisor, Mr. Crabtree reported to the superintendent of streets and sanitation, who reported to the director of public works, who in turn reported to the city manager. The city manager was responsible for determining the budget for public works, including the care and maintenance of the City's unimproved alleys. However, the city manager's determination still had to be approved by the city council.

When asked about the governmental structure of the City, Mr. Crabtree stated that the City has a home rule form of government, in which the mayor and aldermen make the policy determinations. The various city departments, including the public works department, then implement and carry out those policies.

According to Mr. Crabtree, the City did not maintain its unimproved alleys for pedestrian traffic; it maintained the alleys only for vehicular traffic. Mr. Crabtree testified that as soon as weather permitted in the spring, he would refit the City's snow removal equipment for grading

and work with labor crews to regrade the City's unimproved alleys. He testified that it was his practice to make sure that the alley adjacent plaintiff's property was regraded each year prior to the City's Fourth of July parade because of increased pedestrian traffic in the area for the festivities. However, Mr. Crabtree also testified that he did not keep records demonstrating the progress of the annual regrading program, nor did he have any independent recollection that the alley had been regraded prior to July 10, 2004.

When a city resident calls to complain about the condition of an unimproved alley, Mr. Crabtree testified that he would typically go out to the site of the complaint within 48 hours of receiving the call. After examining the site, he would determine whether or not the area needed repair and, if it did, would place the location on his list of pending specific repairs. Only after the city-wide regrading program was complete would Mr. Crabtree perform specific repairs requested by residents. Mr. Crabtree testified that he did not have any record or independent recollection of Ms. Butkus's telephone calls and voice-mail messages complaining about the condition of the alley.

Plaintiff and Ms. Butkus placed their garbage containers in the alley, as opposed to someplace on their property, because the containers had always been in the alley and that was where the neighbors placed their garbage containers. In addition, Ms. Butkus testified, "that's where the city trucks pick it up." Mr. Crabtree confirmed that the City would not pick up refuse, yard waste, or recycling from private property.[2] Pursuant to City ordinance, residents must place their garbage containers on the curb or alley line for pick-up. If a resident's property abuts an

---

[2] The City's web page describing garbage pick-up policies states: "Garbage must be placed on the curb or alley line by 7 a.m.; it will not be collected from private property." (Emphasis in the original.)

alley, then the resident must place his or her garbage containers in the alley. Only if a resident's property does not abut an alley may the resident place garbage containers on the street curb.

At trial, the City attempted to argue that plaintiff did not have to keep her garbage containers in the alley, that she instead could have placed the containers on a concrete pad next to her garage. However, in order to do that plaintiff would have had to pick up the large containers and place them over a fence. That would have been virtually impossible. When plaintiff and Ms. Butkus purchased the property in 2000, they performed several improvements on the property, including constructing a new two-car garage, erecting a fence around the backyard, pouring a concrete pad outside the fence next to the garage, and installing a walkway from the kitchen door to the fence gate to the alley. The City argued that had plaintiff placed her garbage containers on the concrete pad, she could have walked through her backyard, into the garage, and out a garage door to the concrete pad thus avoiding the alley altogether. Plaintiff testified in response that it was far more convenient for her to take a direct route down her backyard path to the gate and out into the alley where the garbage containers were located and that, if she walked through her garage, she still would have had to walk in the alley.

After plaintiff rested her case, the City filed a motion for directed verdict arguing that (1) plaintiff was not an intended user of the alley and therefore the City did not owe her a duty of ordinary care pursuant to section 3-102 (745 ILCS 10/3-102 (West 2008)), (2) the City had no notice of the alleged pothole or depression in the alley, and (3) the City was immune from liability pursuant to section 2-201 (745 ILCS 10/2-201 (West 2008)). The trial court denied the City's motion on all three issues. Speaking specifically to the first issue raised by defendant, the trial court stated: "I think the plaintiff is an intended user."

5

Plaintiff filed a motion for directed verdict after the City rested its case, arguing that (1) plaintiff was an intended user of the alley, (2) the City had notice of the condition of the alley prior to plaintiff's injury, and (3) the City failed to prove discretionary immunity pursuant to section 2-201 (745 ILCS 10/2-201 (West 2008)). When the trial court objected to the form of plaintiff's motion, instructing that a directed verdict is different from deciding an issue as a matter of law, plaintiff amended her motion for directed verdict to cover only the notice issue, and moved to strike the City's affirmative defenses that plaintiff was not an intended user and that the City had discretionary immunity. The trial court struck the City's discretionary immunity defense because it found the City's alley maintenance program ministerial. However, at that time the trial court reserved the issue of whether plaintiff was an intended user of the alley for the jury to decide, and denied plaintiff's motion for directed verdict.

Later, when discussing the language to be used in the jury instructions, plaintiff's counsel argued that the jury should not decide the issue of whether plaintiff was an intended user of the alley. Plaintiff's counsel argued that the issue of intent was a component of the question whether the City owed plaintiff a duty of care, which was a matter of law and not a question of fact for the jury. The trial court agreed.

"THE COURT: We are not going to have a determination by the jury whether this is intended, an intended user. I have determined that as a matter of law.

DEFENSE COUNSEL: So as a matter of law she is an intended user despite Crabtree saying we don't maintain this for pedestrians?

THE COURT: We already ruled on that, yeah."

As noted, the jury returned a verdict in favor of plaintiff in the amount of $201,879, which it reduced by 50% for plaintiff's contributory negligence. The jury also answered two special interrogatories, which found that the City did have notice of the condition of the alley prior to plaintiff's injury. The trial court entered a judgment on the verdict in the amount of $100,939.50. The City then filed a posttrial motion requesting that the trial court grant the City either a judgment *n.o.v.* or a new trial. The trial court denied the City's motion.

## ANALYSIS

The City raises three challenges to the trial court's denial of its request for posttrial relief. First, the City argues that the plaintiff was not an intended user of the municipal alley pursuant to section 3-102(a) (745 ILCS 10/3-102(a) (West 2008)) and that, therefore, the City is entitled to a judgment *n.o.v.* Second, the City argues that even if the trial court did not err in failing to grant the City a judgment *n.o.v.*, the trial court abused its discretion in determining as a matter of law that plaintiff was an intended user of the alley. Finally, the City argues that the trial court improperly denied the City's motion for a directed verdict, arguing that the City had discretionary immunity pursuant to section 2-201 (745 ILCS 10/2-201 (West 2008)). All of the City's arguments involve questions of law, which we review *de novo. Kouzoukas v. Retirement Board of the Policeman's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009); *Addison Ins. Co. v. Fay*, 232 Ill. 2d 446, 451 (2009).

### 1. Was plaintiff an intended user of the alley?

The City first argues that the trial court erred by failing to grant a judgment *n.o.v.* in its favor because plaintiff was not an intended user of the alley. A judgment *n.o.v.* should only be

granted where all of the evidence, when viewed in a light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict could ever stand based on that evidence. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We cannot "usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992). "The court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454.

In order to maintain a cause of action for negligence, plaintiff must establish that the City owed a duty of ordinary care, breached that duty, and an injury was proximately caused by that breach. *Curatola v. Village of Niles*, 154, Ill. 2d 201, 207 (1993). Whether the City owed plaintiff a duty of care is a question of law for the court to decide. *Vaughn v. City of West Frankfort*, 166 Ill. 2d 155, 158 (1995); *Marshall v. City of Centralia*, 143, Ill. 2d 1, 6 (1991).

The Local Governmental and Governmental Employees Tort Immunity Act (Act) limits the common law duties of municipalities. *Marshall,* 143 Ill. 2d at 5; *Curatola,* 154 Ill. 2d at 208. Section 3-102(a) of the Act provides in pertinent part:

> "[A] local public entity has the duty to exercise ordinary
> care to maintain its property in a reasonably safe condition for the
> use in the exercise of ordinary care of people whom the entity
> intended and permitted to use the property in a manner in which

8

and at such times as it was reasonably foreseeable that it would be
used ***." 745 ILCS 10/3-102(a) (West 2008).

Thus, according to the statute, a municipality owes a duty of ordinary care only to those who are both intended and permitted users of municipal property. 745 ILCS 10/3-102(a) (West 2008). Because "the Act 'is in derogation of the common law,' " we must construe it strictly against the municipal defendant. *Vaughn*, 166 Ill. 2d at 158, quoting *Curatola,* 154 Ill. 2d at 208. "[A]n intended user of property is, by definition, also a permitted user; a permitted user of property, however, is not necessarily an intended user." *Boub v. Township of Wayne*, 183 Ill. 2d 520, 525 (1998).

"[T]he duty of a municipality depends on whether the *use* of the property was a permitted and intended use. *** Whether a particular use of property was permitted and intended is determined by looking to the nature of the property itself." *Vaughn*, 166 Ill. 2d at 162-63. "Intent must be inferred from the circumstances." *Sisk v. Williamson County*, 167 Ill. 2d 343, 351 (1995). Both parties agree that plaintiff was a permitted user of the ally; the only issue for us to decide is whether plaintiff was also an intended user.

Generally, "an alley is a roadway designed for vehicular traffic, and the duty imposed on a municipality under section 3-102(a) is the same as that imposed for a street" (*Khali1 v. City of Chicago*, 283 Ill. App. 3d 161, 163-64 (1996)), and municipalities do not owe a duty of ordinary care to pedestrians walking in the street (*Vaughn*, 166 Ill. 2d at 161). However, Illinois courts have recognized narrow exceptions to this rule. One exception is where a municipality has designated areas for street parking. In those cases, pedestrians are intended and permitted users of the roadway for the narrow purpose of entering and exiting the parked vehicle. *Sisk*, 167 Ill.

9

2d at 351; *Torres v. City of Chicago*, 218 Ill. App. 3d 89, 94 (1991) (finding plaintiff an intended user of the roadway when he stepped back from the trunk of a legally parked vehicle: "use of the parking space logically entails pedestrian use of the adjacent areas in order to enter and exit the parked vehicle and such use of the street is therefore also intended and permitted and reasonably foreseeable"); *Di Domenico v. Village of Romeoville*, 171 Ill. App. 3d 293, 295-96 (1988) (finding plaintiff an intended user of the roadway when he stepped off the sidewalk in order to access the trunk of his legally parked vehicle: "It defies common sense to conclude that such local entities did not contemplate and intend that the operator of the vehicle along with passengers would use the street area around the parked vehicle for ingress and egress to and from their vehicle"). This narrow exception extends only to those pedestrians who must necessarily walk in the roadway in order to access a legally parked vehicle; an unnecessary use of the roadway where a legal alternative exists, such as a crosswalk, in order to access a vehicle does not qualify for this exception. *Sisk*, 167 Ill. 2d at 351-52 (finding that plaintiff was not an intended user of a country roadway with no marked parking spaces, walkways, or crosswalks); *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 426 (1992) (finding that plaintiff who crossed a six-lane country highway outside of a crosswalk in order to reach his parked car was not an intended user of the roadway).

Thus, Illinois courts have established that something more than mere necessity is required in order for a pedestrian to be an intended user in a roadway; there must be some affirmative physical manifestation of the municipality's intent that a pedestrian use the roadway. *Boub*, 183 Ill. 2d at 528 (finding that a lack of special pavement markings or other signs indicating that bicycles were intended users of a bridge precluded a finding that plaintiff was an

intended user of the bridge); *Torres v. City of Chicago*, 218 Ill. App. 3d 89, 94 (1991) (finding that where a municipality permits parallel parking on a roadway, it intends that drivers of the vehicle will use the roadway in order to enter and exit the vehicle). Where there are no affirmative physical manifestations of a municipality's intent, necessity cannot apply the duty of ordinary care for a sidewalk to a roadway. *Sisk*, 167 Ill. 2d at 352. In *Sisk*, the plaintiff's motor vehicle struck a concrete bridge crossing a creek, and when plaintiff exited his auto to investigate the extent of the damage, he fell off the roadway and into the creek. 167 Ill. 2d at 346. On appeal, the court held that the municipal defendant had no duty to maintain county roads for pedestrian traffic without some affirmative physical manifestation of intent. *Sisk*, 167 Ill. 2d at 352. As our supreme court explained:

> "In contrast, there are no such manifestations to indicate that Williamson County intended pedestrians to walk on its country roads, much less the specific road and bridges complained of by plaintiff in the case at bar. As the appellate court noted, there are no walkways or crosswalks on rural country roads such as the county-line road in this case. Further, many county roads are gravel roads and often have no shoulder. We believe that the inference to be drawn from these facts, if any, is that municipalities do not intend that pedestrians walk on rural country roads. Although it may be necessary at times for pedestrians to walk on country roads, such use is not a manifestation of the local municipality's intent that pedestrians walk on its country roads or

1-08-3607

> an undertaking by the municipality to make country roads free
> from defects that might injure pedestrians." *Sisk*, 167 Ill. 2d at 351-
> 52.

In the case at bar, we do not have physical manifestations of the City's intent but the City has established a policy requiring its residents to place their trash, recycling, and yard waste containers in the alley, which is municipal property. The policy expressly states that the City will not pick up the refuse from private property; residents *must* use the City property. We have previously held that a person who violates a municipal ordinance referring to a piece of municipal property cannot be an intended user of that property. *Montano v. City of Chicago*, 308 Ill. App. 3d 618, 624 (1999) (a delivery person who violated a city ordinance when stopping his delivery truck in an alley could not be an intended user of the alley).

We have considered the issue of whether pedestrians can be intended users of municipal alleys in three previous cases and in each case, the determination was fact-specific. In *Khalil*, the plaintiff was walking down the middle of an alley in order to get from a parking lot to a restaurant when he tripped in a hole and fell. *Khalil*, 283 Ill. App. 3d at 162. In essence, the plaintiff was using the alley as a sidewalk and there were no affirmative physical manifestations that the defendant municipality intended for pedestrians to walk down the middle of the alley. *Khalil*, 283 Ill. App. 3d at 164. Accordingly, we found that plaintiff was not an intended user of the alley and thus the municipality had no duty to maintain the alley in a condition suitable for pedestrians. *Khalil*, 283 Ill. App. 3d at 164.

In *Kavales v. City of Berwyn*, the plaintiff's decedent was walking along a sidewalk and entered an alley where the alley intersected a sidewalk. *Kavales v. City of Berwyn*, 305 Ill. App.

12

3d 536, 539 (1999). When she entered the alley, the plaintiff's decedent was still within the lines of the sidewalk on either side of the alley. *Kavales*, 305 Ill. App. 3d at 539. She stepped into a "depressed, uneven, and cracked" portion of the alley and fell. *Kavales*, 305 Ill. App. 3d at 539. We determined that, even though plaintiff's decedent was technically in an alley when she fell, the location was in effect a " 'sidewalk area.' " *Kavales*, 305 Ill. App. 3d at 544. Accordingly, we found that plaintiff's decedent was an intended user of the alley where it intersected the sidewalk, because the sidewalk was used for pedestrian traffic. *Kavales*, 305 Ill. App. 3d at 544.

The facts of *Thomas v. Town of Cicero*, 307 Ill. App. 3d 840 (1999), most closely approximate those of the instant case. In *Thomas*, the plaintiff walked through her backyard and out into the alley in order to dispose of a bag of trash in her garbage can, which was located in the alley. *Thomas*, 307 Ill. App. 3d at 842. After she threw away her trash, the plaintiff continued down the alley in order to visit a neighbor. *Thomas*, 307 Ill. App. 3d at 842. After she had progressed several feet down the alley from her garbage can, plaintiff tripped and fell on a crack in the alley. *Thomas*, 307 Ill. App. 3d at 842. In *Thomas*, the defendant municipality admitted that its alleys were " 'easements for people to get [to] their garages, utilities, electric, cable, [and] garbage.' " *Thomas*, 307 Ill. App. 3d at 842. Justice Warren Wolfson, writing for this court, found that the defendant municipality had created a "safe harbor" in which the plaintiff was an intended user of the alley so long as she walked along the path to her garbage can, which is the second narrow exception found by Illinois courts. *Thomas*, 307 Ill. App. 3d at 845. However, once the plaintiff departed from that "safe harbor" and proceeded down the alley to visit her neighbor, she could no longer be an intended user of the alley, merely a permitted one. *Thomas*, 307 Ill. App. 3d at 845. Because plaintiff "had thrown away her garbage and had

13

stepped away from the protection of her easement when she tripped and fell," we found that she was not an intended user of the alley. *Thomas*, 307 Ill. App. 3d at 845.

Justice Wolfson's safe harbor analysis should apply in the instant case. See *Thomas*, 307 Ill. App. 3d at 845. When the City enacted its ordinance directing plaintiff to place her yard waste, trash, and recycling containers in the alley, it created a safe harbor in which plaintiff could walk along the alley in order to reach the containers. The ordinance provides, in pertinent part, as follows:

> "(A) Residences With Access To An Alley: All residences which abut upon an alley shall designate a collection site at the edge of the property directly adjacent to such alley. Where practicable, the site shall not be fenced or otherwise closed off in such a manner as to impede efficient collection. Any gates leading to the collection site from the alley shall be unlocked. The collection site may be on the alley itself, provided that containers shall not interfere with the free movement of vehicles in the alley.

> (B) Residences Without Alley Access:

> 1. Occupants of residences whose property does not abut an alley shall locate garbage containers along the curb immediately adjacent to the property ***." Evanston City Code § 8-5-10 (2004).

Plaintiff complied with the City's ordinance and garbage pick-up policy when she placed her waste containers in the alley and thus should fall within a safe harbor, where pedestrians are

intended users of the alley when they walk in the alley only to access their waste containers.

The City argues that it was unnecessary for plaintiff to enter the alley in order to dispose of her yard waste, and thus plaintiff was not an intended user of the alley because she could have kept her waste containers on the concrete pad next to her garage. We are not persuaded by this argument. First, the concrete pad is part of plaintiff's private property. The City's waste pick-up policy clearly states that the City will not pick up waste from private property. Therefore, the City's suggestion is not a viable option, as it violates the written policy. Second, even if plaintiff was able to access her waste containers from the concrete pad, the City's argument is analogous to saying that the driver of a legally parked vehicle should climb over the gear shift and exit the vehicle from the passenger side door in order to avoid walking in the roadway. We have previously found that where a municipality manifests an intent that people park their vehicles on the street, the municipality also intends that the occupants of those vehicles walk in the roadway for the purpose of accessing the parked autos. See, *e.g., Torres*, 218 Ill. App. 3d at 94. That same analysis should apply here as well. In the instant case, the City, by passing an ordinance that residents must place their waste containers in the alley, manifested an intent that plaintiff place her waste containers in the alley. The logical inference is that the City also intended that plaintiff be able to access her waste containers and that means walking in the alley in order reach them.

Finally, the City's argument would have us penalize plaintiff for improving her property. The City's argument implies that if plaintiff had not installed the concrete pad, then she would have been an intended user of the alley when she walked in the alley in order to access her waste containers. Plaintiff installed the concrete pad after purchasing the property in 2000. The previous owners had kept their waste containers in the alley and had no alternative location, such

as a concrete pad, in which to place them so as to avoid walking in the alley in order to throw away their garbage. As our supreme court has made clear, we must look to the nature of the municipal property to determine the municipality's intent. *Vaughn*, 166 Ill. 2d at 162-63. Therefore we cannot look to improvements or changes made to private property abutting the City's property to determine the City's intent with respect to its own property. But, the City argues, once plaintiff installed the concrete pad, the City no longer intended for plaintiff to walk in the alley. A municipality's intent cannot change because of an independent act of a third party without some affirmative manifestation of that changed intent on the part of the municipality. *Boub*, 183 Ill. 2d at 528.

The City also argues that the trial court abused its discretion in deciding whether plaintiff was an intended user of the alley as a matter of law, rather than allowing the jury to decide the issue. We do not find this argument persuasive. "The 'intended and permitted' determination informs the duty issue, and the duty issue is a question of law." *Thomas*, 307 Ill. App. 3d at 845, citing *Khalil*, 283 Ill. App. 3d at 162-63. The trial court acted well within its discretion when it determined that plaintiff was an intended user of the alley as a matter of law.

Accordingly, we find that plaintiff was an intended user of the alley and the City owed her a duty of care pursuant to 745 ILCS 10/3-102 (West 2008).

2. Did the City have discretionary immunity?

The City also argues that it was immune from liability pursuant to section 2-201 (745 ILCS 10/2-201 (West 2008)). Governmental entities bear the burden of properly raising and proving that they are immune under the Act in order to bar plaintiffs' recovery. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 370 (2003).

16

1-08-3607

The Act grants immunity to municipal defendants engaged in certain discretionary acts. 745 ILCS 10/2-201 (West 2008). Section 2-201 provides as follows:

> "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2008).

Section 2-209 allows municipalities to shelter under the immunity granted to public employees covered by section 2-201. 745 ILCS 10/2-109 (West 2008) ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable").

Our supreme court has held that the Act sets up, in essence, a two-part test to determine which employees may be granted discretionary immunity under section 2-201. An employee may qualify for discretionary immunity "if he holds *either* a position involving the determination of policy *or* a position involving the exercise of discretion." *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 341 (1998). However, an employee who satisfies the first prong of the test must also have engaged in *both* the determination of policy *and* the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted. *Harinek*, 181 Ill. 2d at 341. Whether the act or omission in question is discretionary or ministerial must be determined on a case-by-case basis. *Snyder*, 167 Ill. 2d at 474; *Anderson v. Alberto-Culver USA, Inc.*, 317 Ill. App. 3d 1104, 1113 (2000).

17

Therefore, we must determine, first, whether Crabtree was in a position involving the determination of policy or an exercise of discretion and, second, whether he both determined policy and exercised discretion when maintaining the alley. See *Harinek*, 181 Ill. 2d at 341. Policy determinations, as used in section 2-201, involve " 'those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests.' " *Harinek*, 181 Ill. 2d at 342, quoting *West v. Kirkham*, 147 Ill. 2d 1, 11 (1992). "[D]iscretionary acts are those which are unique to a particular public office, while ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act." *Snyder v. Curran Township*, 167 Ill. 2d 446, 474 (1995). " 'A municipal corporation acts judicially or exercises discretion when it selects and adopts a plan in the making of public improvements, but as soon as it begins to carry out that plan it acts ministerially and is bound to see that the work is done in a reasonably safe *** manner.' " *Greene v. City of Chicago*, 73 Ill. 2d 100, 108 (1978), quoting *Johnston v. City of East Moline*, 405 Ill. 460, 466 (1950). Our supreme court further explored the contours of discretionary versus ministerial acts in *In re Chicago Flood Litigation*:

> "Official action is judicial where it is the result of
>
> judgment or discretion. Official duty is ministerial when it is
>
> absolute, certain and imperative, involving merely the execution of
>
> a set task, and when the law which imposes it, prescribes and
>
> defines the time, mode and occasion of its performance with such
>
> certainty, that nothing remains for judgment or discretion.

[Citation.] A [municipal] corporation acts judicially, or exercises discretion, when it selects and adopts a plan in the making of public improvements, such as constructing sewers or drains; but as soon as it begins to carry out [the] plan, it acts ministerially, and is bound to see that the work is done in a reasonably safe and skillful manner.' " *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 194 (1997), quoting *City of Chicago v. Seben*, 165 Ill. 371, 377-78 (1897).

Two lines of cases have emerged as Illinois courts have considered the issue of what constitutes "determining policy" and "exercising discretion" for the purposes of applying discretionary immunity. 745 ILCS 10/2-201 (West 2008). The first line of cases follows the reasoning of *Greene* and maintains that when a municipal employee is deciding whether and how to implement a program of maintenance and improvements, that employee is "determining policy" and "exercising discretion" as required by section 2-201. *Greene*, 73 Ill. 2d at 108; see, *e.g., Chicago Flood Litigation*, 176 Ill. 2d at 194; *Hanley v. City of Chicago*, 343 Ill. App. 3d 49, 57 (2003). But once the employee is carrying out that maintenance or improvement program, the employee's actions are ministerial and do not give rise to discretionary immunity. *Greene*, 73 Ill. 2d at 108; see, *e.g., Snyder*, 167 Ill. 2d at 474-75; *Anderson*, 317 Ill. App. 3d at 1117.

The second line of cases seems to find that any act that would result in liability for a municipality is "determining policy" and "exercising discretion." *Courson v. Danville School District No. 118*, 333 Ill. App. 3d 86, 91 (2002) (finding that a shop teacher's decision to remove the safety shield from a saw involved a determination of policy and an exercise of discretion);

19

1-08-3607

*Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 395 (2000) (finding that laborers' decisions concerning how to fill potholes involved a determination of policy and an exercise of discretion); *Johnson v. Decatur Park District*, 301 Ill. App. 3d 798, 809 (1998) (finding that a tumbling coach's decisions not to ensure adequate placement of safety mats and not to warn of the dangers inherent in using a mini trampoline involved determinations of policy and exercises of discretion).

Our supreme court has offered some guidance on determining what sorts of positions involve "determining policy" and "exercising discretion." 745 ILCS 10/2-201 (West 2008). Most recent cases granting discretionary immunity involve decisions that took place at the executive or policy-making level. *Arteman v. Clinton Community School District No. 15*, 198 Ill. 2d 475, 487 (2002) (school district decided not to provide roller blading safety equipment for a high school physical education class), *superseded on other grounds by statute as stated in Murray v. Chicago Youth Center*, 224 Ill. 2d 213 (2007); *Harinek*, 181 Ill. 2d at 342 (fire marshal planned and executed a fire drill in a downtown high-rise); *Chicago Flood Litigation*, 176 Ill. 2d at 195 (City of Chicago retained discretion to change location of bridge pilings).

In *Harinek*, the plaintiff alleged that she suffered injuries resulting from the fire marshal's negligent conduct during the course of a fire drill. *Harinek*, 181 Ill. 2d at 338. During the fire drill, the marshal directed an entire floor of people, including the plaintiff, to stand in the vicinity of a heavy, windowless door in a crowded elevator area, where more people were placed than the area could hold. *Harinek*, 181 Ill. 2d at 338. When the door was suddenly pushed opened, it struck and injured the plaintiff's head, causing serious injury. *Harinek*, 181 Ill. 2d at 338. The supreme court affirmed the trial court's dismissal of the plaintiff's complaint on the

20

grounds that the fire marshal was entitled to discretionary immunity under section 2-201 of the Act. *Harinek*, 181 Ill. 2d at 343. The court reasoned that the fire marshal was in a position involving the determination of policy because he "bears sole and final responsibility for planning and executing fire drills in buildings throughout Chicago" and that he both determined policy and exercised discretion in the course of the fire drill at issue in the complaint. *Harinek*, 181 Ill. 2d at 343. Justice Garman proposed the following framework for explaining the court's reasoning in *Harinek*:

> "First, we should ask: Where does the official whose action is challenged stand in the relevant hierarchy of decisionmakers? Did he bear the sole and final responsibility for the decision in question, or was his decision to act as he did subject to review and approval by others? The higher the official stood in the relevant chain of command, the more likely it is that he acted with discretion for the purposes of section 2-201." *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 392 (2003) (Garman, J., dissenting, joined by Fitzgerald, J.).

In our analysis, we must determine whether or not Mr. Crabtree was "serving in a position involving the determination of policy and/or the exercise of discretion," as required for discretionary immunity under section 2-201. See 745 ILCS 10/2-201 (West 2008). Mr. Crabtree never testified that he made determinations of policy. Instead, he testified that such determinations came from the mayor and aldermen of the City. Crabtree merely checked out residents' complaints about the condition of specific alleys and, from those complaints, made a

list of locations which needed repairs. There is no evidence in the record of this case that his list was used as the basis of repairs that were made, and other people in the city also provided lists for repair.

In fact, Crabtree testified that he had no record or independent recollection of that alley during the spring of 2004. Since the City had established a program of annually regrading all its unimproved alleys, carrying out this regrading program appears to be "absolute, certain and imperative, involving merely the execution of a set task." *Chicago Flood Litigation*, 176 Ill. 2d at 194. In addition, our supreme court has made clear that while the decision of whether to implement a program of repairs is both a determination of policy and an exercise of discretion, carrying out that program is a ministerial act. *Greene*, 73 Ill. 2d at 108; see, *e.g., Snyder*, 167 Ill. 2d at 474-75; *Anderson*, 317 Ill. App. 3d at 1117. The instant case fits squarely within this general rule and we see nothing in the record to indicate that Mr. Crabtree's actions or lack of actions in maintaining the alley is the sort of conduct that would be immune from liability under the Act.

Defendant points to *Wrobel v. City of Chicago* in support of the proposition that laborers who fix potholes hold positions requiring both the determination of policy and the exercise of discretion and thus are eligible for discretionary immunity under section 2-201 (745 ILCS 10/2-201 (West 2008)). *Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 395 (2000). In *Wrobel*, the plaintiffs alleged that they suffered injuries resulting from the defendant municipality's negligent repair of a pothole. 318 Ill. App. 3d at 391. The record in *Wrobel* disclosed how the work was done. We affirmed the trial court's grant of summary judgment in favor of the defendant on the grounds that the defendant was entitled to discretionary immunity under section 2-201,

1-08-3607

explaining:

> "These workers are directed by [their foreman] to remove 'as much' loose asphalt and existing moisture in a pothole 'as possible' before applying the cold mixture. While they are obligated to undertake such measure pursuant to the express directive of their foreman, the workers enjoy discretion in determining how much asphalt and moisture should be actually extracted and whether that amount is indeed adequate to ensure a durable patch.
>
> The decisions of the workers in this regard can also fairly be characterized as policy determinations. When confronted with a particular stretch of roadway, the workers must necessarily be concerned with the efficiency in which they prepare any potholes for repair. Specifically, the workers must allocate their time and resources among the various potholes that will be repaired, and they must ensure that not too much time is dedicated to pothole preparation. The more time and resources the workers devote to preparing potholes for a patch, the less time and resources they have available to repair the other potholes existing throughout their daily grid.
>
> For the same reasons discussed above, the extent of the workers' removal efforts represent both a determination of policy and an exercise of discretion. The degree to which a pothole should be prepared, and specifically how much loose asphalt and moisture will be removed, is a matter of a worker's personal judgment, and encompassed within that judgment are the policy considerations of time and resource allocation during a given

23

workday." *Wrobel*, 318 Ill. App. 3d at 395.

In the case at bar, there is nothing in the record to show that any work was done in the alley, certainly not how it was done. Every case must be decided on the evidence and facts of that case. The burden was on the city to prove how and why it is entitled to immunity and it has failed to sustain that burden. *Van Meter*, 207 Ill. 2d at 370.

We distinguish *Wrobel* on its facts. In *Wrobel* the question of the defendant's negligence focused on the minutiae of *how* municipal workers repaired a particular pothole, because there was no dispute that the municipal defendant had patched the pot hole just days before the plaintiffs' injury. *Wrobel*, 318 Ill. App. 3d at 395. This inquiry examined such factors as how much water a worker removed from a pothole before patching it and what sort of material was used to form the patch. *Wrobel*, 318 Ill App. 3d at 395. In the case at bar, the City had established a program to annually regrade its unimproved alleys. Glen Crabtree, a public works supervisor for the City, testified that he usually regraded the alley in question prior to the Fourth of July. However, Mr. Crabtree testified that he had no record that he had regraded the alley prior to July 10, 2004, and that he had no independent recollection that he had done so, or what had been done. Thus the question for the jury was not whether the City properly prepared the depression that tripped plaintiff, or whether the City utilized the proper materials. The question was far more simple: was the alley repaired and was it repaired adequately? When the jury returned a verdict in favor of plaintiff, two reasonable inferences can be drawn: either the City did not regrade the alley prior to July 10, 2004, or, even if the City did regrade the alley during that spring, the regrading was negligently carried out. The City presented no facts at trial to suggest that the regrading process in the instant case involved the sort of complex, location-

specific determinations that were in question in *Wrobel*. In the case at bar, Crabtree testified that the city made annual repairs, but there is no evidence of what they did.

Our supreme court has made clear that whether a municipality engages in a program of public improvement is a discretionary matter but the manner in which the municipality implements the program is not. *Snyder*, 167 Ill. 2d at 474-75 ("We are also mindful of the long-standing common law principle that, although a governmental agency has discretion in determining whether to perform a public work or make an improvement, once the decision to perform the work is made, it must be done with reasonable care and in a nonnegligent manner"); see also *Baran v. City of Chicago Heights*, 43 Ill. 2d 177, 180-81 (1969) ("In holding a city responsible for injuries thus caused the court is not reviewing the city's discretion in selecting a plan. It is not controlling or passing upon the city's estimate of public needs. Nor is it deciding what the 'best' kind of improvement may be. It is simply saying that when a city creates a hazardous condition and someone is injured as a consequence it must respond in damages, just as others are required to do"). This indicates that discretionary immunity should not extend to a municipality's actions when carrying out a program of maintenance and repair such as the one in the case at bar.

In addition, 20 days before the opinion in *Wrobel* was published, we explicitly stated that we would not grant discretionary immunity to every act performed by a public employee. We cautioned against an overly expansive reading of section 2-201, explaining:

> "Every failure to maintain property could be described as an
> exercise of discretion under municipal defendants' expansive
> approach to governmental immunity. The legislature could not

> have intended such a result; otherwise, it would not have codified the common law duty to maintain property under section 3-102 of the Act. The Act must be strictly construed against the public entity involved." *Anderson*, 317 Ill. App. 3d at 1117, citing *Aikens v. Morris*, 145 Ill. 2d 273, 278 (1991).

Notwithstanding the findings in *Wrobel*, we will continue to construe section 2-201 strictly against municipal defendants.

The City argues that Mr. Crabtree exercises discretion in determining which alleys to regrade, when, and with what materials. While this may be true, Mr. Crabtree was not the final arbiter of whether plaintiff's alley would be regraded or otherwise repaired in the spring of 2004. Ms. Butkus testified that she had complained about the condition of the alley via telephone and e-mail to Alderman Tisdahl. Alderman Tisdahl had come to inspect the condition of the alley near plaintiff's fence gate and agreed that the condition was poor and in need of repair. Alderman Tisdahl then assured Ms. Butkus that she would put the alley on the City's priority list for spot repairs. Thus, Alderman Tisdahl, not Mr. Crabtree, exercised discretion in determining that plaintiff's alley should be repaired. Once Alderman Tisdahl made the decision that plaintiff's alley needed repair, Mr. Crabtree no longer had discretion to determine whether the alley needed attention. His role became purely ministerial: carrying out the maintenance requested by the alderman.

Again, the City points to *Wrobel* and argues that Mr. Crabtree exercised discretion in determining *how* to fill the depressions in the alley by plaintiff's fence gate. If the City had presented evidence at trial that Mr. Crabtree had in fact repaired the depressions by regrading the

26

alley then we would be presented with the question of whether Mr. Crabtree exercised discretion in choosing which materials to use in the regrading. However, no such evidence was presented at trial. Instead we only have Mr. Crabtree's assertion that he attempts to regrade this particular alley in time for the Fourth of July parade each year and so he must have regraded the alley by that time in 2004. This is not an issue of whether Mr. Crabtree used the correct materials in regrading the alley, but rather whether he regraded the alley at all. There was no evidence presented at trial that he did.

Once Alderman Tisdahl put plaintiff's alley on the priority list for repairs, Mr. Crabtree no longer had discretion to decide whether or not to allocate City resources for the repair of plaintiff's alley. That decision had been taken out of his hands. All that was left for Mr. Crabtree was to carry out the requested maintenance, an act that we have previously found to be ministerial.

The City argued at oral argument that the trial court prevented it from presenting a complete discretionary immunity defense pursuant to section 2-201. 745 ILCS 10/2-201 (West 2008). However, the record does not support that assertion. Plaintiff called Mr. Crabtree as an adverse witness pursuant to section 2-1102 (735 ILCS 5/2-1102 (West 2008)). While Mr. Crabtree was on the stand, the City cross examined him in great detail about his duties as a public works supervisor and his role in the City's alley maintenance program. After plaintiff rested her case, the City moved for a directed verdict because, among other arguments, it claimed that it had discretionary immunity pursuant to section 2-201 (745 ILCS 10/2-201 (West 2008)). The trial court denied that motion. Then the City recalled Mr. Crabtree as a witness in its case in chief and questioned him further about his role in the public works department. After the

City rested its case, plaintiff filed a motion for directed verdict claiming that the City had failed to sufficiently prove discretionary immunity. The trial court determined, after hearing all of the evidence presented to the jury, that the City had failed to establish that it qualified for discretionary immunity under the Act. 745 ILCS 10/2-201 (West 2008). The City was given the opportunity to present its case; the trial court did not bar the City from arguing discretionary immunity until after the City had presented all of its evidence on the issue. The City has the burden of proving that it qualifies for discretionary immunity and the City failed to meet that burden. *Van Meter*, 207 Ill. 2d at 370.

Accordingly, we find that the trial court correctly barred the City from presenting a discretionary immunity defense pursuant to section 2-201 (745 ILCS 10/2-201 (West 2008)).

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

J. GORDON and McBRIDE, JJ., concur.